UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at ASHLAND

Civil Action No. 12-46-HRW

DERRICK STEVENS,
Administrator of the Estate of
Paul E. Stevens,                                                    PLAINTIFF,


v.                        MEMORANDUM OPINION AND ORDER


ARCH WOOD PROTECTION, INC., et al.                          DEFENDANTS.


This is a failure to warn products liability action wherein Plaintiff alleges the decedent, Mr.

Paul E. Stevens (Mr. Stevens), sustained harm from being occupationally exposed to toxic levels of

a chemical used to preserve the wood in utility poles. [Docket No. 1]. The Court has before it

several fully briefed motions. Specifically, Defendants, two chemical manufacturers and three

wood-treating companies, have filed Motions for Summary Judgment challenging different aspects

of causation, including product identification and medical causation, and argue the employer's

failure to properly train and warn Mr. Stevens was the superseding cause of his injuries. [Docket

Nos. 156, 159, 161, 162 and 163]. Defendants have also filed a Motion for Summary Judgment

arguing Plaintiff cannot establish his failure to warn claim against the chemical manufacturers

because his expert admitted his opinion was not directed to them. [Docket No. 159]. In addition,

both Plaintiff and Defendants have filed *Daubert* Motions challenging the admissibility of certain

testimony of their opponents' experts. [Docket Nos. 157, 158, 160, 162, 164, 165, 166, 167, and

168].

In considering these various challenges, the issue of product identification looms large. Plaintiff is unable to present sufficient evidence supporting a reasonable inference that he was exposed to these Defendants' specific products. Thus, for the reasons more fully set forth below, the Court finds that the Defendants are entitled to judgment as a matter of law. As the lack of product identification is dispositive of the case, the other challenges regarding causation and opinion testimony are moot.

## I.  FACTS

Mr. Stevens worked as a pole climber and a supervisor on a line crew for Kentucky Power Company (Kentucky Power) from May 11, 1981, until May 19, 2011. [Docket Nos. 1, ¶ 6, 139-4, pg. 10 and 180-1]. Plaintiff Derrick Stevens, as the administrator of his father's estate, claims that during Mr. Stevens's employment at Kentucky Power he was exposed to arsenic, chromium and copper contained in chromated copper arsenate (CCA)–a substance used to preserve the wood in utility poles and cross-arms. [Docket Nos. 1, ¶¶ 5, 7 and 139-4, pgs. 10-11]. Mr. Stevens was allegedly exposed to CCA while handling, sawing, and drilling CCA-treated wood as part of his employment duties, as well as through fighting fires on the CCA-treated utility poles.[1] *Id.* Plaintiff alleges that Mr. Stevens was diagnosed with "systemic adverse health effects consistent with exposure to arsenic from the CCA treated wood," including malignant melanoma. [Docket No. 1,

---

[1]Various employees of Kentucky Power testified that from the late 1990s until 2012 utility pole fires started occurring more frequently due to faulty equipment that was being installed on the poles. [Deposition of William Lynch, Docket No. 180-4, pg. 33-34 (Mr. Lynch testified pole fires began in the late 1990s and were still a problem when he retired in 2010); Deposition of William Fraley, Docket No. 180-3, pg. 18-19 (Mr. Fraley testified "prime time" for pole fires was in 2008 to 2012); Deposition of Lloyd McCarty, Docket No. 180-2, pg. 46-47 (Mr. McCarty testified pole fires first started in late 1990s, but became more frequent starting in 2008 because of faulty insulators installed on the poles)].

¶¶ 8, 9]. Mr. Stevens died on October 6, 2012, at the age of 55, due to complications from his malignant melanoma.[2] [Docket Nos. 36 and 186-2, pg. 2].

Mr. Stevens filed this action against three producers of CCA (the chemical-manufacturing Defendants: Arch Wood Protection, Inc. (Arch), Osmose Inc. (Osmose), and Chemical Specialties, Inc. (CSI)) and three companies that purchased CCA from the producers (the wood-treating Defendants: Koppers, Inc. (Koppers), Langdale Forest Products Company (Langdale), and T.R. Miller Mill Company, Inc. (T.R. Miller)) and used it to treat utility poles and cross-arms.[3] [Docket No. 1]. Plaintiff claims that Defendants knew of the health hazards caused by CCA exposure, but failed to warn of the dangers. [*Id.* at ¶¶ 12, 14-17, 19-21, 24-25, and 27-31].

Defendants Arch and Osmose admit in their respective Answers that they manufactured CCA and sold it to certain of the wood-treating Defendants. [Docket Nos. 39, pgs. 2-3 and 41, pgs. 2-3]. Defendants Koppers, Langdale, and T.R. Miller admit that they purchased CCA preservative from Arch, Osmose or CSI to treat utility poles that were sold to Kentucky Power.[4] [Docket Nos. 13, pgs. 3-5; 40, pgs. 2-3; 42, pgs. 2-3; 180-7, pgs. 3-4; 180-8, pgs. 3-4 and 180-11, pgs. 4-5]. Specifically, Koppers and T.R. Miller admit they bought CCA from Arch. [Docket Nos. 180-7, pg. 3 and 180-8,

---

[2]Upon Mr. Stevens death, Derrick Stevens, Administrator of the Estate of Paul E. Stevens, was substituted as Plaintiff herein. [Docket No. 36].

[3]On July 1, 2013, Chemical Specialties, Inc. was voluntarily dismissed from this case pursuant to its settlement with Plaintiff. [Docket No. 68].

[4]It is not clear from Plaintiff's briefing whether there are three or four companies licensed to manufacture and sell CCA in the United States. Plaintiff cites to an EPA Notice of Cancellation Order, 68 Fed. Reg. 17366-01 (Apr. 9, 2003), which references a fourth registrant, Phibro-Tech, Inc., as being licensed to manufacture and sell CCA in the United States. [Docket No. 180, pg. 4]. However, later in his briefing, Plaintiff states Arch and Osmose are two of three CCA manufacturers licensed to sell CCA in the United States. *See id.* at pg. 10. Regardless, the wood-treating Defendants do not identify having purchased CCA from a fourth manufacturer.

pg. 3]. Defendant Langdale admits it bought CCA from CSI and Osmose. [Docket Nos. 180-11, pg. 3 and Deposition of James Hickman, 180-14, pgs. 7-8]. Mr. Hickman, Langdale's technical director, testified that in the mid-1980s Langdale purchased CCA from both Osmose and CSI. [Docket No. 180-14, pgs. 3, 12-13]. Mr. Hickman testified it is his understanding that from 2000 to 2007 Langdale was buying its CCA almost exclusively from CSI, and in 2007 it began buying its CCA almost exclusively from Osmose. *Id.* at pg. 13.[5]

The wood-treating Defendants contend that while they sold CCA-treated poles to Kentucky Power, they were not the only suppliers. Plaintiff provided records from Kentucky Power of its purchases of CCA-treated utility poles during the period February 20, 1992 to April 2003, and Defendants provided excerpts of these same records.[6] [Docket Nos. 139-2, 180-15 and 180-16, pg. 5]. These records demonstrate that Kentucky Power purchased CCA poles during this time period from at least 9 suppliers, including the three wood-treating Defendants Koppers, T.R. Miller and Langdale. [Docket Nos. 139-2, 180-15 and 180-16, pg. 5-7].

Plaintiff admitted in response to Defendant Kopper's discovery requests that he "[d]oes not know the specific locations or addresses where the alleged exposures occurred."[7] [Docket No. 139-4, pg. 12]. Instead, Plaintiff points to the deposition testimony of Mr. Stevens's co-workers as

---

[5] Plaintiff states it is probable that there were times when the CCA from CSI and Osmose were intermixed in the holding tank at Langdale when a new supply of CCA was delivered from one company while chemical from the other remained in the holding tank. [Docket No. 180, pg. 5 n.3 (citing Deposition of Nathaniel Runyan, Docket No. 180-9, pgs. 39, 60)]. In support, Plaintiff references invoices from 2009 that suggest CCA from CSI and Osmose were intermixed. *Id.* However, as Defendants note, Kentucky Power was not purchasing CCA-treated poles in 2009. [Docket No. 180-16, pg. 5]. Nevertheless, the Court will assume such a situation could have occurred at other times.

[6] In April 2003 Kentucky Power stopped purchasing CCA poles altogether. [Docket No. 180-16, pg. 5].

[7] Mr. Stevens died before he could be deposed in this case.

4

demonstrating he had daily contact with CCA-treated utility poles during his employment. As a lineman at Kentucky Power, Mr. Stevens would have built new power lines, repaired storm trouble, and set poles. [Deposition of Lloyd McCarty, Docket No. 180-2, pgs. 19, 29-30]. In doing so, he would have come into contact with CCA poles, as well as creosote and pentachlorophenol ("penta") poles.[8] *Id.*

Mr. Fraley, a line crew supervisor who worked with Mr. Stevens "quite often," testified that he worked with Mr. Stevens on pole fires "a lot." [Docket No. 180-3, pgs. 10-12, 17]. Mr. Fraley had a specific recollection of Mr. Stevens being in a bucket truck during a pole fire and putting the fire out by pouring water on it. *Id.* at pgs. 45-46. He recalled Mr. Stevens pouring water on pole fires an estimated six times. *Id.* at pg. 46. Mr. Fraley also testified that drilling a CCA utility pole was a routine part of his job. *Id.* at pg. 100. He testified he saw Mr. Stevens drill utility poles, a task he described as a daily part of Mr. Stevens's job. *Id.* at pg. 101. Mr. Fraley did not know how many poles Mr. Stevens climbed in his career or how many pole fires he attended. *Id.* at pg. 84. He also was not aware of anyone having tried to identify which poles Mr. Stevens climbed or extinguished fires on during his career. *Id.*

Mr. Lynch, another line crew supervisor, also testified that Mr. Stevens was often on his crew. [Docket No. 180-4, pgs. 8, 19]. Mr. Lynch testified that he saw Mr. Stevens work a pole fire

---

[8]Creosote and penta are two other types of treated utility poles used at Kentucky Power over the years. [Deposition of Lloyd McCarty, Docket No. 180-2, pgs. 26-29]. The types of poles can be identified by their color: CCA poles are green; penta poles are brown, and creosote poles are black. Mr. McCarty testified that all three types of poles were already in use in 1988 when he started with Kentucky Power. *Id.* pgs. 26-27. He also stated that from 1988 to about 2004, all of the new poles were CCA poles. In April 2003, Kentucky Power switched from CCA poles to penta poles because they were easier to work on; the CCA poles were harder to climb and to drill. [Docket No. 180-16, pg. 5; *see also* Deposition of Ronald Canfield, Docket No. 180-20, pgs. 17-18].

5

"many times"– he "worked a lot of them and he was always the man in the bucket truck" trying to put the fire out. *Id.* at pgs. 32-33, 65. Mr. Lynch did not remember Mr. Stevens climbing a pole to put a fire out. *Id.* at pg. 66. Mr. Lynch was also not aware of anyone trying to identify the poles on which Mr. Stevens worked to extinguish fires. *Id.* at pgs. 100-01.

Mr. McCarty also testified that over the years he worked on crews with Mr. Stevens. [Docket No. 139-7, pgs. 23-24, 31-34, 44-45]. Mr. McCarty recalled seeing Mr. Stevens climb a CCA-treated pole, and would assume he extinguished pole fires because every lineman did. [Docket Nos. 139-7, pgs. 73-74, 86 and 139-9, pgs. 133-34]. While Mr. McCarty recalled Mr. Stevens was on his crew and thus knew he had to work pole fires as a member of his crew, he could only specifically recall Mr. Stevens working two pole fires. [Docket No. 139-7, pgs. 156-57]. Mr. McCarty recalled Mr. Stevens putting out one fire with bottled water after the burning portion of the pole was lowered to the ground, but he could not recall the name of the road where the fire occurred and did not identify the manufacturer of that pole. [Docket Nos. 139-7, pgs. 156-57 and 139-9, pgs. 135-36]. Mr. McCarty also recalled Mr. Stevens working a pole fire on Route 503, but did not identify a specific pole or manufacturer. [Docket Nos. 139-7, pg. 157].

Defendants seek summary judgment, arguing Plaintiff cannot point to any evidence that Mr. Stevens was exposed to their specific products and thus cannot meet his burden of proving that Defendants' products were a substantial cause of Mr. Stevens's injuries. [Docket No. 156-1]. In response, Plaintiff argues he has presented sufficient evidence from which a jury could reasonably conclude that Mr. Stevens was exposed to the chemical-manufacturing Defendants' CCA contained in the wood-treating Defendants' utility poles and that this exposure was a substantial factor in causing his illness. [Docket No. 180]. Alternatively, Plaintiff argues that each of the two chemical-

manufacturing Defendants has the burden of proving its chemical did not cause Mr. Stevens's illness under a concert of action theory. *Id.*

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate if the materials in the record "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The evidence must be viewed in the light most favorable to the nonmoving party and all reasonable inferences must be drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.* Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the nonmoving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.

### B.  Plaintiff has not presented sufficient evidence that Mr. Stevens was exposed to Defendants' products.

In Kentucky, as part of any products-liability claim, a plaintiff must tie his injury to the defendant's product. *Collins v. Ansell Inc.*, No. 3:98-cv-259-H, 2003 WL 22769266, at *2 (W.D. Ky. Nov. 19, 2003); *see also In re Beverly Hills Fire Litig.*, No. 77-79, 1979 U.S. Dist. LEXIS 15403, at **8-9 (E.D. Ky. Nov. 14, 1979) (plaintiff must identify the product causing the harm and

link it to a particular defendant); *In re Martin v. Cincinnati Gas & Elec. Co.*, No. 02-201, 2006 WL 6353627, at *1 (E.D. Ky. 2006) ("Within the context of asbestos litigation, as with product liability generally, a plaintiff must identify the injury-causing product and its manufacturer in order to survive summary judgment.") (citing *Roberts v. Owens-Corning Fiberglas Corp.*, 726 F. Supp. 172, 174 (W.D. Mich. 1989).[9] To that end, a plaintiff is required to show, for each defendant, that he was exposed to the defendant's product. *Cf. Lindstrom v. A-C Product Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005), *see also Mannahan*, 2016 WL 3887037, at *3 (quoting *Lindstrom*, 424 F.3d at 492).

After a plaintiff proves his exposure to a defendant's product, he must then establish that the exposure to the product was a substantial factor in causing the harm. *Collins*, 2003 WL 22769266, at *3 (court found no evidence upon which a reasonable fact finder could conclude the substantial and proximate cause of plaintiff's harm was more likely than not her exposure to defendant's product); *see also Moeller v. Garlock Sealing Tech.*, 660 F.3d 950, 954 (6th Cir. 2011) (noting, under Kentucky law, a plaintiff is required to prove a defendant's conduct was a substantial factor in bringing about the harm and stating "[c]ausation requires a link between the specific defendant's conduct and the plaintiff's injuries"). The substantial factor test requires the Court "to determine 'whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff.'" *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 92 (Ky. 2003) (citing *Deutsch v. Shein*, 597

---

[9]There is a recent consistent Kentucky Court of Appeals decision. *Mannahan v. Eaton Corp.*, __ S.W.3d __, 2016 WL 3887037, at *3 (Ky. Ct. App. July 15, 2016) ("[T]he threshold question in every asbestos case is whether the plaintiff was exposed at *all* to the defendant's [] product. . . . Simply put, the plaintiff must prove that the defendant supplied the product that caused the plaintiff's disease or injury.") (emphasis original) (citations omitted). However, a motion for discretionary review, filed August 12, 2016, is pending before the Kentucky Supreme Court in that case and thus it is not yet final.

S.W.2d 141 (Ky. 1980)); Restatement (Second) of Torts § 431(1)(a)). While causation is generally a question of fact for the jury, it "should not go to the jury unless the inference of causation is reasonable: it must 'indicate the probable, as distinguished from a possible cause.'" *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (quoting *Briner v. Gen. Motors Corp.*, 461 S.W.2d 99, 101 (Ky. 1970)).

Here, Defendants argue that the wood-treating Defendants are entitled to judgment as a matter of law because Plaintiff has not identified a single pole that Mr. Stevens worked on and thus cannot connect Mr. Stevens's injury to the wood-treating Defendants' utility poles. Similarly, Defendants argue that the chemical-manufacturing Defendants are also entitled to summary judgment because without evidence of what CCA-treated poles Mr. Stevens was exposed to, there is no evidence from which Plaintiff can identify the CCA preservative used in the treatment process for those poles. Plaintiff admitted that he does not know the specific location or addresses where Mr. Stevens's alleged exposures occurred, and he has not pointed this Court to any testimony or other evidence of Mr. Stevens specifically working on or around one of the wood-treating Defendants' utility poles. [Docket No. 139-4, pg. 12]. Thus, the Court does not have before it any direct evidence that Mr. Stevens was exposed to any of the wood-treating Defendants' utility poles or any of the chemical-manufacturing Defendants' CCA.

Instead, Plaintiff seeks to meet his burden by presenting what he contends is sufficient circumstantial evidence to present to a jury. Plaintiff maintains that the deposition testimony of Mr. Stevens's coworkers demonstrates that he worked on CCA-treated poles in the normal course of his work, including drilling poles and extinguishing pole fires. None of these employees, however,

9

could recall a specific pole Mr. Stevens worked on and could not testify that he worked on a pole supplied to Kentucky Power by one of the wood-treating Defendants. This is fatal to Plaintiff's case.

Plaintiff maintains this case is analogous to asbestos cases and argues that summary judgment can be avoided for lack of product identification by demonstrating that a defendant's product is in the "immediate work area" of the plaintiff. [Docket No. 180, pg. 16 (citing *Martin*, 2006 WL 6353627, at **3-4)]. Plaintiff states that it is undisputed that during the relevant time period the wood-treating Defendants supplied CCA-treated poles, poles treated with the chemical-manufacturing Defendants' CCA, to Kentucky Power's Ashland location where Mr. Stevens worked.[10] He also points to evidence that Kentucky Power was able to identify 18 pole fires where Mr. Stevens was known to be on site. [Docket No. 180-18]. Plaintiff argues this evidence is sufficient, given the nature of his cumulative exposure, to defeat a motion for summary judgment based on lack of product identification, as a jury can reasonably infer that exposure to Defendants' products was a substantial factor in causing Mr. Stevens's injuries. [Docket No. 180, pgs. 10-11].

In support of his argument, Plaintiff relies on *Martin*, 2006 WL 6353627. In *Martin*, the executor of an estate of a decedent who died of mesothelioma brought claims against General Electric Company (GE). Plaintiff's claims against GE stemmed from "household" or "bystander"

---

[10]Specifically, Plaintiff points to: 1) the wood-treating Defendants' admissions that they each supplied CCA-treated poles to Kentucky Power that were treated by one or more of the chemical-manufacturing Defendants' CCA [Docket Nos. 180-7, pgs. 3-4, 180-8, pgs. 3-4 and 180-11, pgs. 4-5]; 2) Kentucky Power's purchasing records evidencing that it purchased CCA-treated poles from the wood-treating Defendants during the time period of February 1992 and March 2003, and that some of the poles were delivered to Kentucky Power's Ashland location [Docket No. 180-15]; 3) Defendant Koppers' production of 749 pages in response to a discovery request seeking all invoices from 1985 to 2011 of CCA utility poles to Kentucky Power [Docket Nos. 180-21 and 180-22]; and 4) an April 14, 1989, internal trip report from American Electric Power, wherein the author reported on his trip to inspect five present or potential suppliers of poles, including its then current suppliers Koppers and T.R. Miller (whom the report stated were "currently providing roughly 20% of [their] system distribution poles") [Docket No. 180-17].

exposure where he alleged the decedent was exposed to asbestos contained in GE's products when his father, having been exposed to such products at work, carried the fibers home on his work clothes. *Id.* at *1. The decedent's father worked for the Cincinnati Gas & Electric Company (CG&E) and, during the relevant time frame, he spent much of his time working in manholes, substations, and transformer vaults. Plaintiff alleged it was in such places that the decedent's father was exposed to GE's asbestos-containing products.

GE sought summary judgment on grounds that plaintiff failed to offer sufficient evidence connecting the decedent to any of its asbestos-containing products.[11] The decedent's father had testified that he could not recall who manufactured the insulating material he worked with in the manholes and he believed insulation was the only asbestos-containing material he came in contact with. A representative of CG&E testified that other asbestos materials were used in the manholes, but he too could not identify the manufacturer or supplier of the materials. To connect GE to the decedent's illness, plaintiff submitted internal memoranda, invoices, order forms, and instruction manuals that purportedly connected GE's asbestos-containing products with the decedent's father's "immediate work environment." Plaintiff also offered evidence of asbestos abatement, which indicated that asbestos materials had been found during the relevant time frame in "areas in which [the decedent's father] was known to have worked."

The Court recognized that "[w]ithin the context of asbestos litigation, as with product liability generally, a plaintiff must identify the injury-causing product and its manufacturer in order to survive summary judgment. *Id.* at *3 (citing *Roberts*, 726 F. Supp. at 174). The court further

_____

[11]The court noted there was little dispute that the decedent's cause of death was mesothelioma and that it is caused by asbestos.

noted that [u]nder Section 431 [Restatement (Second) of Torts], a plaintiff cannot establish the requisite connection between his injury and a particular asbestos product manufacturer by merely showing that the manufacturer's product was present somewhere at his place of work . . . a plaintiff must establish that the manufacturer's asbestos product was used at the specific site within the workplace where he worked." *Id.* (quoting *Roberts*, 726 F. Supp. at 174). Looking to the evidence, the court concluded that the plaintiff had presented sufficient circumstantial evidence that GE manufactured and/or supplied at least some of the asbestos-containing materials "found in the manholes in which [the decedent's father] worked." *Id.* at *5. Thus, the court found sufficient evidence of the identity of the manufacturer/supplier of the allegedly harmful products. *Id.*

Plaintiff argues *Martin* is important because of its factual similarity to the case at bar and demonstrates that summary judgment based on product identification can be defeated in toxic tort cases by pointing to "circumstantial evidence that a particular defendant supplied some of the harmful product the plaintiff was exposed to." [Docket No. 180, pg. 10]. Plaintiff argues Mr. Stevens's injury was not caused by one specific pole, but by every CCA pole he came in contact with over the years, resulting in cumulative exposure "as high as 500 parts per billion per day measured over a two-week work week." *Id.* at. pg. 11 (citing report of exposure expert John P. Wargo, PhD). Plaintiff further argues that he has presented sufficient circumstantial evidence from which a jury could conclude Mr. Stevens was exposed to Defendants' products by pointing to evidence that Kentucky Power purchased CCA utility poles from the wood-treating Defendants, treated with the chemical-manufacturing Defendants' CCA, that Mr. Stevens regularly worked on CCA-treated poles, and identifying specific locations where Mr. Stevens fought fires. *Id.* at pgs. 10-16.

Defendants argue *Martin* is distinguishable because it is an asbestos case, involving mesothelioma, a signature condition from asbestos exposure. [Docket No. 185, pg. 7]. Defendants point out that because of the friable nature of asbestos fibers, the court found it was sufficient, in the asbestos context, that plaintiff place the defendants' products in the plaintiff's vicinity. Defendants explain the same reasoning does not apply in this case because, unlike asbestos, CCA-treated utility poles are identifiable and melanoma is not a signature condition of arsenic exposure. *Id.*

Notwithstanding any distinction that can be made as to the applicability of asbestos cases to the case at bar, *Martin* is distinguishable. In *Martin*, the court stated that the plaintiff had provided exhibits purporting to connect GE's asbestos-containing products "with [the decedent's father's] immediate work environment." The court concluded plaintiff had presented circumstantial evidence that GE provided at least some of the asbestos-containing material "found in the manholes in which [decedent's father] was known to have worked." Here, however, while Plaintiff has demonstrated that the wood-treating Defendants sold CCA-treated utility poles to Kentucky Power, he has not pointed to any evidence demonstrating that any of the wood-treating Defendants' utility poles were used at the specific sites where he worked.

Plaintiff worked as a lineman, stationed out of the Ashland Service Center, but the work he performed on utility poles was at work sites, which spanned a large geographic area "from Morehead to South Shore," covering thousands of poles. [Deposition of Fred Manning, Docket No. 139-5, pg. 17; Deposition of Lloyd McCarty, Docket No. 180-2, pg. 19]. While Kentucky Power supplied records that provided information from which Plaintiff could locate the specific work sites where Mr. Stevens fought fires, there is no evidence Plaintiff used these records to try to identify the supplier of any of the utility poles located at those work sites.

13

Specifically, Mr. Canfield, a 30(b)(6) witness for Kentucky Power, reviewed a report of the outage cases for the period May 6, 1997, to September 5, 2014, and identified 431 instances of a pole fire.[12] [Docket Nos. 180-19 and 180-20, pgs. 22-30]. He testified that the outage reports do not identify the individuals working each job. *Id.* at pg. 31. However, Mr. Canfield explained that in 2003, Kentucky Power starting tracking pole fires on work orders by using a specific project number, 1785, for pole fires. *Id.* at pgs. 34-40. At some point, Kentucky Power stopped using a specific project number for pole fires and switched back to using a general project number, 1818, for all trouble calls, which would include fires as well as other problems.

Mr. Canfield was able to perform a search from 2007 to the "present time" of all employees who charged time to the two project numbers.[13] *Id.* at pgs. 70-79. From this report, Mr. Canfield ascertained that Mr. Stevens charged time on 18 work orders reflecting he was present at a pole fire. *Id.* at pgs. 77-78, 101 and Docket No. 180-18. In addition, the record reflects that from 2007 until he left Kentucky Power in 2011, Mr. Stevens charged time to 11 work orders reflecting he worked a trouble call, which may or may not have involved a pole fire. [Docket No. 180-18]. Plaintiff has not pointed to any evidence of who manufactured any of the utility poles involved in the work orders to which Mr. Canfield testified Mr. Stevens charged time. As Defendants point out, the evidence

---

[12]Mr. Canfield stated this number may underrepresent the total number of pole fires because his calculation was based solely on his review of the descriptions on outage reports. If a data provider did not include the words "pole fire" or "burned pole" he did not count it as a fire. [Docket No. 180-20, pgs. 22-30]. In addition, he recognized that he may have missed a few entries referencing a pole fire while performing his manual review. *Id.* at pg. 27.

[13]Mr. Canfield testified that Exhibit 7 to his deposition, Docket No. 180-18, reflects all of the work orders that Mr. Stevens charged time to under the project number for either a pole fire or a trouble call from 2007 to "the present time." [Docket No. 180-20, pgs. 77-78]. Mr. Canfield's deposition was taken on October 23, 2014. Thus, this document appears to reflect all pole fires Kentucky Power has a record of Mr. Stevens working from 2007 until his last day of work on May 19, 2011. *Id.*; *see also* Docket No. 139-4, pg. 11.

supplied by Kentucky Power contained information from which Plaintiff could have determined the location of at least some of the 18 pole fires and 11 trouble calls, and the Court's review of these documents revealed that some include pole numbers, street/road names and maps. [Docket Nos. 180-18, 180-24 and 180-25]. Indeed, Plaintiff admitted in his Response that not only do Kentucky Power's records identify "specific locations" where Mr. Stevens worked a pole fire, but that each CCA utility pole has a supplier's identifying mark on it. [Docket No. 180, pgs. 6, 11-12]. Thus, Plaintiff could have determined the supplier of at least some of the utility poles present at his work sites, but apparently did not undertake that task. Consequently, Plaintiff has not pointed to evidence placing Defendants' products in Mr. Stevens's "immediate work environment." Merely stating that Defendants' products were somewhere at Kentucky Power is not sufficient to demonstrate their presence at the specific work sites where he worked. *See Martin*, 2006 WL 6353626, at *3 (citing *Roberts*, 726 F. Supp. at 174).

This case is more analogous to *Collins* v. *Ansell Inc.* In *Collins*, the Western District of Kentucky found the plaintiff's circumstantial evidence attempting to link the defendant latex glove manufacturer with her latex allergy was insufficient to withstand summary judgment where such a link was based on speculation. *Collins*, 2003 WL 22769266. In *Collins*, the plaintiff admitted she had no evidence that she had direct contact with defendant's gloves, but argued that because the gloves had been supplied to her hospital employer and were used in the hospital (although in a different building), it was possible they had caused her injury by someone moving the gloves from place to place or by airborne contaminates. *Id.* at *2. The court noted plaintiff's theories did not have an adequate evidentiary foundation to sustain the reasonable inferences necessary to support them. *Id.* at *3. Thus, the fact that the defendant supplied gloves to the hospital and that they were

15

used somewhere in the hospital where plaintiff worked was insufficient, on its own, to demonstrate her injury more likely than not was caused by her exposure to defendant's product.[14]

Plaintiff attempts to distinguish *Collins* by arguing he has presented ample evidence that the wood-treating Defendants' CCA-treated utility poles were present in Mr. Stevens's workplace and that he had daily contact with CCA-treated poles. [Docket No. 180, pg. 11 n.6]. *Collins* is not so easily distinguished however. As in *Collins*, Plaintiff has only demonstrated that the wood-treating Defendants' products, along with those of at least 6 other suppliers, were used by Mr. Stevens's employer. Also like *Collins*, Plaintiff has not presented any evidence that he came into contact with or was exposed to these particular Defendants' products. As the *Collins* court concluded, simply pointing to the fact that Defendants' products were used somewhere at Kentucky Power, without more, does not make it more likely than not that the 3 wood-treating Defendants' CCA-treated utility poles, or the chemical-manufacturing Defendants' CCA, were a substantial factor in causing Mr. Stevens's injuries.

To further support their position, Defendants cite to *Bryant v. Tri-County Electric Membership Corporation,* 844 F. Supp. 347 (W.D. Ky. 1994). The Court also finds *Bryant* instructive on this issue. In *Bryant*, the owners of a sawmill brought a claim against a manufacturer of electrical transformers, Kuhlman, arguing a 1988 fire that destroyed the sawmill was caused by a defect in transformers that were used at the sawmill prior to their removal in October 1986. *Id.* at

---

[14]The court withheld entering judgment on behalf of the movant latex manufacturer, however, because Plaintiff was awaiting discovery from the multi-district litigation that she claimed supported causation. *Collins*, 2003 WL 22769266, at *3. Because the court was unsure if the additional evidence would prevent summary judgment, it permitted plaintiff additional time to obtain her evidence. In a later summary decision, the court noted plaintiff had not filed additional discovery or a supplemental memorandum, and granted summary judgment in favor of the defendant glove manufacturer for the reasons stated in the prior decision. *See Collins v. Ansell, Inc.*, 2004 WL 524912 (W.D. Ky. Mar. 2, 2004).

353-54. The owners maintained the transformers gradually caused damage to a switch, and the switch eventually exploded causing the fire. Kuhlman sought summary judgment arguing plaintiff had no evidence it manufactured the defective transformers. Plaintiffs admitted they did not have direct evidence Kuhlman manufactured the defective transformers, but argued the fact that Kuhlman was one of six manufacturers the electric company purchased transformers from in 1986 was sufficient to raise a question of fact as to whether the defective transformers were Kuhlman transformers. *Id.*

The court disagreed, finding that Kuhlman being one of a limited number of transformer manufacturers who supplied transformers to the electric company did not support an inference that Kuhlman manufactured the defective transformers at issue. The court held "Kentucky law simply does not permit a jury to hold a party liable on the strength of a one-in-six possibility that the party acted irresponsibly." *Id.* at 354. The court noted plaintiff offered no evidence of distinctive characteristics of the transformers that would allow a reasonable jury to decide they were made by Kuhlman as opposed to one of the other five manufacturers. *Id.* The court granted summary judgment for Kuhlman, finding plaintiffs could not identify Kuhlman as the manufacturer of the transformers that allegedly contributed to plaintiffs' injuries.

*Bryant* is analogous to the situation at hand. Kentucky Power purchased CCA-treated utility poles from at least nine suppliers from 1992 to 2003, but has no knowledge of where each pole purchased is located in its vast network. The onus is upon Plaintiff to demonstrate Defendants' products caused his harm. Plaintiff's position seems to be that the jury will assume Mr. Stevens had to have had exposure to Defendants' products because it is undisputed they were supplied to Kentucky Power. Without more, this is not a permissible evidentiary inference to argue before a

jury. While it is undisputed that Kentucky Power bought CCA-treated utility poles from the three wood-treating Defendants, it is also undisputed that it purchased CCA-treated utility poles from at least six other suppliers. In addition, the chemical-manufacturing Defendants are two of four producers of CCA. Without direct or circumstantial evidence that Mr. Stevens was exposed to any of the wood-treating Defendants' utility poles [not to mention fought a pole fire or drilled or manipulated the pole] or to the chemical manufacturers' CCA, there is no basis to present this to a jury and permit it to infer that exposure to any of Defendants' products was a substantial factor in the harm he sustained. A jury verdict must be based on something other than speculation, supposition or surmise.

Further, Plaintiff cites to the report of John P. Wargo, PhD., his exposure expert who provided an assessment of Mr. Stevens's exposure to CCA to support his argument that Mr. Stevens's harm was caused by cumulative exposure. But this does not aid in his burden to prove Mr. Stevens's exposure to Defendants' products was a substantial factor in causing his harm. Dr. Wargo opined on various pathways of Mr. Stevens's exposure to inorganic arsenic on CCA poles in general for purposes of demonstrating sufficient exposure to CCA to support medical causation. [Docket No. 180-6]. Dr. Wargo did not opine as to Mr. Stevens's exposure to each of the wood-treating Defendants' utility poles or the chemical-manufacturing Defendants' CCA. In fact, Dr. Wargo's report does not even specifically mention the Defendants and does not aid in product identification.

In conclusion, Plaintiff has not pointed to any evidence that Mr. Stevens handled, sawed, drilled or fought a fire on a wood-treating Defendants' CCA-treated utility pole or that he was otherwise exposed to the chemical-manufacturing Defendants' CCA. Kentucky Power's purchase of CCA-treated poles from the wood-treating Defendants and its installation of those poles

somewhere in its network, points only to a possibility rather than the probability that Mr. Stevens worked on a pole supplied by one of the wood-treating Defendants and treated with CCA produced by a chemical-manufacturing Defendant. Further, the record produced by Kentucky Power identifying 18 instances where Mr. Stevens charged time to a pole-fire project number establishes the probability only that the poles involved in those fires were supplied by a wood-treater, the 3 wood-treating Defendants here being a 3 in 9 chance of supplying. In fact, Plaintiff has not presented any evidence of what company supplied the poles that are referenced in that report, despite the fact the supporting documents contained information from which he could have located at least some of the poles and identified their suppliers. Plaintiff has not set forth sufficient circumstantial evidence to permit a jury to reasonably infer that Mr. Stevens was exposed to Defendants' particular products, and thus he cannot demonstrate that their products were a substantial factor in causing Mr. Stevens's harm. Accordingly, summary judgment is warranted.

### C. Plaintiff has not established the essential elements of "concert of action".

In Count II of his Complaint, captioned "punitive damages," Plaintiff alleges that the chemical-manufacturing Defendants, Arch, Osmose and CSI (who has now been dismissed) "acted in concert to prevent warning labels from being affixed to the CCA treated utility poles and cross-arms, knowing [they] were necessary to safeguard utility workers, including Paul Stevens, from the proven hazards of exposure to arsenic on and in the CCA treated wood." [Docket No. 1, ¶¶ 26-31]. Plaintiff argues such acts and omissions demonstrate "a high degree of moral turpitude warranting the imposition of punitive damages." *Id.* at ¶ 31. Given its caption, the chemical-manufacturing Defendants interpreted this as asserting a claim for punitive damages for their failure to warn and

therefore did not address it specifically in the Motion for Summary Judgment on Product Identification. [Docket No. 156-1].

However, in response to Defendants' Motion for Summary Judgment on Product Identification, Plaintiff argues he can establish the elements of a concert of action theory against Arch and Osmose, via the allegations in Count II. [Docket No. 180, pgs. 17-20]. Thus, while labeling Count II as a punitive damage claim, Plaintiff is relying upon the theory of "concert of action" as a means of meeting his burden of product identification as to Arch and Osmose. While it is not clear whether Plaintiff initially intended Count II to set forth a concert of action theory in support of his product liability claim against Arch and Osmose as he now argues, the Court will nevertheless construe Count II as raising concert of action.

Kentucky law recognizes a concert of action theory in product liability cases. *Farmer v. City of Newport,* 748 S.W.2d 162 (Ky. Ct. App. 1988). In *Farmer,* the Kentucky Court of Appeals adopted on Section 876 Restatement (Second) of Torts, which provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct separately considered, constitutes a breach of duty to the third person.

*Id.* (quoting Restatement (Second) of Torts, § 876).

Plaintiff's assertions fall under§ 876(a) of the Restatement because he alleges Arch and Osmose acted in concert to prevent warning labels from being affixed to CCA-treated utility poles and concealed the known hazards of CCA. [Docket Nos. 1, ¶29 and 180, pgs. 18-19]. There are no allegations that warrant the application of the other two subsections of the Restatement.

20

Federal courts in Kentucky have applied three elements in analyzing concert of action in product liability cases.[15] *Eastridge v. Goodrich Corp.*, No. 3:12-cv-862-S, 2014 WL 4916236, at *3 (W.D. Ky. Sept. 30, 2014); *Dawson v. Bristol Labs*, 658 F. Supp. 1036, 1039-40 (W.D. Ky. 1987); *In re Beverly Hills*, 1979 U.S. Dist. LEXIS 15403. These elements are:

> First, plaintiffs must identify the product causing the harm and prove that the defendants' acts in marketing and promoting the allegedly defective product were a substantial factor in causing the plaintiff's injuries . . . Second, plaintiffs must establish that the defendants acted by cooperative or concerted activities . . . Finally, plaintiffs must prove defendants contravened a particular standard of care.

*Eastridge*, 2014 WL 4916236, at *3 (quoting *Dawson*, 658 F. Supp. at 1038-40). Allegations of mere parallel activity of two or more defendants, without more, are insufficient to prove defendants acted by cooperative or concerted activities under the concert of action theory. *Smith v. Univar USA, Inc*, No. 12-134-ART, 2013 WL 1136624, at *5 (E.D. Ky. Mar. 18, 2013); *Dawson*, 658 F. Supp. at 1039-40. To show concerted action, a plaintiff must point to evidence suggesting an agreement or common design between the defendants. *Smith*, 2013 WL 1136624, at *5 ; *Dawson v. Bristol Labs.*, Nos. 83-937L, 83-941L, 83-942L, 83-992L, 1988 WL 123929, at * 3 (W.D. Ky. 1988).

Plaintiff argues he can establish the above elements with three documents. The Court has reviewed these documents and they do not support a finding that Arch and Osmose acted by cooperative or concerted activities to commit a tortious act. Specifically, as discussed below, they

---

[15]Defendants argue that concert of action only applies where a plaintiff has an absolute inability to identify the particular defendant that caused his injury. [Docket No. 185, pg. 12 (citing *In re Beverly Hills*, 1979 U.S. Dist. LEXIS 15403)]. However, Judge Forester considered a similar argument in a cigarette product liability case and stated he believed defendant was reading *Dawson v. Bristol Laboratories*, 658 F. Supp. 1036 (W.D. Ky. 1987), stating the same concept, too narrowly and in a manner inconsistent with Kentucky law. *Barnes v. Philip Morris, Inc.*, No. 98-106, 1999 WL 34813784, at *3 (E.D. Ky. Mar. 24, 1999) (citing *Farmer*, 748 S.W.2d at 164 (holding that plaintiffs stated a claim based on concert of action "[d]espite the fact that [plaintiffs] could identify the specific manufacturer of the [product]")).

fail to prove that Arch and Osmose acted *in concert* "to prevent warning labels from being affixed to the CCA treated utility poles" or to "conceal[] the known hazards of the CCA chemical ." [Docket No. 180 pg. 18].

First, Plaintiff points to a 1985 administrative decision from the Environmental Protection Agency ("EPA") as evidence that Arch and Osmose acted by cooperative or concerted activities to prevent warning labels from being affixed to CCA-treated utility poles and to conceal the hazards of CCA. [Docket Nos. 180, pg. 19 (citing *In re Chapman Chemical Co.*, FIFRA Docket No. 529 (1985)) and 180-27]. Plaintiff infers that the chemical-manufacturing Defendants were involved in this administrative challenge to the EPA's authority to regulate CCA-treated wood. That challenge was successful, and the administrative law judge held, among other things, that the EPA did not have authority under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) to require labels to be placed on pressure-treated wood as a requirement for registration of the preservatives at issue. [Docket No. 180-27, pgs. 1, 30, 60].

Defendants argue that "lawful participation in the political process, including lobbying individually or through industry trade groups, is a far cry from evidence of cooperative or concerted activities under the second prong of the concert of action theory." *Id.* In support of their argument, Defendants cite *Smith v. Univar USA, Inc.* In *Smith*, the plaintiffs alleged the defendants acted in concert to conceal the dangers of the chemicals they made and sold to their employer without proper warning by: 1) substantially assisting the others' efforts to keep consumers ignorant of the dangers of the chemicals; 2) sponsoring its own misleading research about the chemicals' dangers to substantiate the other defendants' inadequate warnings; and 3) creating joint defense agreements and coordinating their responses to government agencies to "present false or misleading information

22

about the health risks" of the chemicals. *Id.* at *1. The court dismissed the claim, noting parallel activity was insufficient to state a concert of action and finding there were no factual allegations suggesting an agreement or common design between the defendants or any allegations of what substantial assistance each defendant gave to the other defendants.

Similarly, in *Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222 (N.Y. 1992), the court held a trial court erred in not granting summary judgment to a manufacturer on concert of action based on a defendant's and other manufacturers' parallel activities directed to a government agency as well as lobbying efforts. The court held a manufacturer of a multipiece tire rim that separated explosively killing plaintiff's decedent could not be subject to concerted action liability based on the defendant's and other manufacturer's lobbying efforts. The plaintiff had alleged and submitted evidence that the rim manufacturers had: campaigned through their trade association for OSHA to make employers rather than manufacturers responsible for safe truck maintenance; decided not to issue warnings; successfully lobbied against a ban on production of mulitpiece rims; and declined to voluntarily recall the rims at issue. *Id.* The court concluded that these activities were insufficient to support the plaintiff's claim of concert of action because plaintiff's evidence demonstrated only parallel activity by the rim manufactures, it did not "raise an issue of fact as to whether the rim manufacturers were parties to an agreement or common scheme to commit a tort." *Id.* at 224-25.

Similarly, here, Plaintiffs have not pointed to any evidence demonstrating that Arch or Osmose acted by agreement or common design to prevent warning labels from being affixed to CCA poles or to conceal the dangers of CCA as alleged. At most, the EPA administrative decision suggests both Arch and Osmose were involved in a legal challenge to the EPA's authority to regulate labeling of treated wood as part of its registration process. However, a review of the administrative

case does not suggest Arch, Osmose and/or any other chemical manufacturers formed an agreement or acted in concert to prevent warning labels being placed on the poles. Moreover, there is no showing of any specific involvement by Arch and Osmose in this process, or that what involvement they presumably did have was anything other than parallel activity to legally challenge the EPA's exercise of unauthorized authority. Nor is the Court inclined to speculate in this regard.

Second, Plaintiff asserts that a 2001 Memorandum from American Wood Preservers Institute (AWPI) is evidence that the chemical-manufacturer's acted cooperatively or by concerted activity to prevent warning labels from being affixed to CCA-treated poles or to otherwise conceal known hazards of CCA. [Docket No. 180-28]. In the memorandum, AWPI's President and CEO explained that AWPI, Arch, Osmose and CSI had been working with the EPA to develop an enhanced consumer awareness program for CCA-preserved lumber. *Id.* The memorandum then explains the aspects of the new program, including labeling with "new key safety statements" for certain products, and encouraged its members to implement the new program promptly. To the extent Plaintiff argues this memorandum demonstrates Arch and Osmose were working in concert, that is not enough. The Plaintiff must demonstrate that the "manufacturers acted tortiously, pursuant to a common design . . . ." *Farmer*, 748 S.W.2d at 164; *see also Rastelli*, 591 N.E.2d at 225 (must prove activity was tortious in nature).

To the extent Plaintiff implies that because the new program referenced in the memorandum did not include labeling for CCA utility poles is evidence of Arch and Osmose's concerted action to preclude labeling on utility poles, the memorandum does not support his argument. In fact, the memorandum demonstrates the new program was not intended to preclude labeling of utility poles. The memorandum provides:

24

[S]everal pole or piling treaters have asked [] about the new enhanced consumer awareness program. Certainly, you should begin using the Consumer Safety Information Sheets. And if you want to include the new labels on your poles and pilings, that would be fantastic.

[Docket No. 180-28]. The fact the chemical manufacturers worked with the EPA to develop a voluntary consumer awareness program and to develop industry standards in this regard does not demonstrate a concerted action to commit a tortious act or to aid another in wrongful conduct. *See cf. Dawson*, 1988 WL 123929, at \*2 (W.D. Ky. 1988) (granting summary judgment finding the fact all defendants adopted same warning language proposed by FDA did not demonstrate concerted action).

Lastly, Plaintiff claims that a document identified as technical data on CCA-treated poles, which he claims constitutes evidence that Arch and Osmose "have produced marketing materials advertising their product as being safe," but that they "contradict safety information about the hazards of the CCA chemical and CCA utility poles." [Docket No. 180 pg. 18]. Although Plaintiff argues that this document is evidence of Arch and Osmose's marketing materials, this document does not suggest in any way that they had an agreement or otherwise worked in concert to produce marketing materials. A review of the pamphlet reveals that it is was produced solely by Arch. There is nothing in the pamphlet that references Osmose or otherwise suggests Arch and Osmose were working together to either prevent warning labels from being affixed to CCA-treated utility poles or to conceal known hazards of the poles. Nor has Plaintiff pointed to any testimony suggesting that this pamphlet establishes such an agreement or joint effort to this end. Even if Plaintiff could prove that Osmose produced a pamphlet or other materials containing information similar to that contained in the pamphlet produced by Arch, this would be insufficient to establish that Arch and Osmose

25

acted in concert, absent some evidence of a tacit or express agreement between the two Defendants. Again, at most, this would suggest parallel activity, which, as discussed herein, is insufficient to establish concert of action. *See Smith*, 2013 WL 1136624, at *5 (citing *Dawson*, 658 F. Supp. at 1040).

These three documents are the extent of the evidence Plaintiff points to in his effort to demonstrate a concert of action theory against Arch and Osmose. As discussed, these documents do not evidence any agreement, tacit or otherwise, between Arch and Osmose to preclude warning labels from being affixed to CCA-treated utility poles or to conceal the dangers of CCA. Thus, Plaintiff has not demonstrated he has any evidence to prove these Defendants acted cooperatively or in concert to carry out a tortious act as is necessary to maintain a concerted action theory. At most, the evidence demonstrates these two manufacturers engaged in parallel action, which is not sufficient. Without proving concert of action, Plaintiff's claims against Arch and Osmose on this theory cannot survive Defendants' Motions for Summary Judgment on Product Identification. *See Dawson*, 1988 WL 123929, at * 3 (granting summary judgment, finding "plaintiffs have not shown the court any memorandum, any letter, any shred of an agreement that would imply the defendants cooperated or acted in concert").

III.    **CONCLUSION**

**IT IS ORDERED** that:

1.    Defendants' Motions for Summary Judgment on Product Identification [Docket Nos. 156 and 163] is **SUSTAINED**;

2.      Plaintiffs having failed to demonstrate a prima facie element of their case sufficient

to survive summary judgment, all other pending Motions [Docket Nos. 157, 158, 159, 160, 161, 162,

164, 165, 166, 167, 168] are **OVERRULED AS MOOT**; and

3.      Judgment is entered in Defendants' favor and this matter is **stricken** from the active

docket of the Court.

Dated this 28th day of September, 2016.



Signed By:
*Henry R. Wilholt, Jr.*
United States District Judge